**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LUIS J. MARQUEZ,** | : | |
| | : | |
| **Plaintiff** | | **CIVIL ACTION NO. 3:12-1280** |
| | : | |
| **v.** | | |
| | : | **(JUDGE MANNION)** |
| **CAROLYN COLVIN,[1]** | | |
| **Acting Commissioner of the** | : | |
| **Social Security Administration** | | |
| | : | |
| **Defendant** | : | |

**M E M O R A N D U M**

Luis J. Marquez sustained a series of back injuries that came from a fall off his parent's roof, lifting various heavy objects, and an off-road vehicle roll-over. He reports back and leg pain that is often excruciating and has made him unable to work. He has been treated by several doctors, one of whom refused to prescribe him with any more narcotics because of his overuse. He presents this court with a relatively sparse medical record dating back to January 2008. The record contains little objective evidence, few detailed notes from his now-treating physician, and appears to be based mostly on Mr. Marquez's own subjective evaluation of his condition. The plaintiff also claims he has various mental impairments that he has suffered over the years.

---

[1]On February 14, 2013, Carolyn Colvin became acting Commissioner of the Social Security Administration. Pursuant to Fed.R.Civ.P. 25(d), she has been substituted as the defendant.

Again, the lean medical records conflict and the plaintiff's own background is inconsistent with his self-reported symptoms. After an earlier application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") was denied in October 2009, he filed this application two months later. As the ALJ thoroughly analyzed and reviewed the plaintiff's medical history, properly evaluated his impairments, and found him able to complete light and sedentary work, the appeal is denied.

## I.   PROCEDURAL BACKGROUND

The record in this action, (Doc. 7), has been reviewed pursuant to 42 U.S.C. §405(g) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for DIB and SSI under the Social Security Act, ("Act").   42 U.S.C. §§401-433, 1381-1383f.

The plaintiff, Luis J. Marquez, initially filed for DIB and SSI benefits on December 11, 2009, while a prior claim for the same benefits was under review by the appeals council. (Doc. 8). His application was initially denied on April 20, 2010, (TR. 97-106), and he filed a request for a hearing by an Administrative Law Judge ("ALJ"). (TR. 107). That request was granted and a hearing was held approximately eleven months later. (TR. 132). He was represented by counsel during that hearing and plaintiff's counsel requested the ALJ reopen his prior application, but the ALJ denied that request. (TR. 40). The ALJ issued a decision determining the plaintiff had a residual

2

function capacity to engage in gainful employment from the date of his application to the date of the decision on April 7, 2011. (TR. 17-36). The Appeals Council declined to review the ALJ's determination on June 6, 2012. (TR. 1). As such, the ALJ's decision is the final determination of disability by the Commissioner.

The plaintiff filed his complaint against the defendant on July 5, 2012, (Doc. 1), requesting this court review the determination of the ALJ finding the plaintiff not eligible for DIB and SSI. The plaintiff filed his brief on September 24, 2012, (Doc. 8), and the defendant filed her brief on October 26, 2012. (Doc. 11). The case is now ripe for this courts ruling.


## II.   STANDARD OF REVIEW

When reviewing the denial of disability benefits, the court must determine whether the denial is supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988)*; Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999), *Johnson*, 529 F.3d at 200. It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §423(d)(2)(A).


## III.   DISABILITY DETERMINATION PROCESS

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §404.1520. See also *Plummer v. Apfel,* *186 F.3d 422, 428 (3d Cir. 1999)*. If the Commissioner finds that a plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. §404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's

4

impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §404.1520.

Here, the ALJ determined that claimant has severe impairments, including lumbar disc disorder and Attention Deficit Disorder (ADD), but retains the residual functional capacity ("RFC") to perform a limited range of sedentary and light work, with certain nonexertional limitations and accommodations, and that therefore he is not disabled under 20 C.F.R. §404.1520(g).

## IV.   THE ALJ'S DECISION

Using the above-outlined procedure, the ALJ found that plaintiff met the insured status requirements of the Act through June 30, 2012, and that plaintiff had not engaged in substantial gainful activity since October 21, 2009, the alleged onset date. The ALJ found that plaintiff has severe impairments consisting of lumbar disc disorder and Attention Deficit Disorder (ADD), but that plaintiff did not have an impairment or combination of impairments which met or medically equaled the severity of the listed impairments of 20 C.F.R. Part 404, Subpart B, Appendix 1. The ALJ found that the plaintiff had the RFC to perform a limited range of sedentary and light work, with the nonexertional limitations that the work be unskilled, involve only occasional interaction with the public, and include normal breaks throughout the day. Moreover, the plaintiff's work can only require occasional stooping, kneeling, crouching,

5

squatting, and climbing stairs. The plaintiff may also not work in high exposed places, around fast-moving machinery, or vibrating objects/surfaces. The ALJ also determined that the plaintiff had the capacity to perform past relevant work as a developer, automatic.[2] The ALJ found the plaintiff was born on October 31, 1977 and was thirty-one years old at the time of the alleged disability onset date, making him a "younger individual" under 20 C.F.R. §404.1563. The ALJ additionally found that plaintiff has limited education and can communicate in English, that transferability of his job skills is not an issue because using the Medical-Vocational Rules supports a finding that the plaintiff is "not disabled," that jobs which he can perform exist in significant numbers in the national economy, and that he was not disabled as defined by the Act from October 21, 2009, through the date of the ALJ's decision. (Tr. 21-24, 30-32).

## V.   EVIDENCE OF RECORD

At the time of the ALJ's decision the plaintiff was a 33-year-old male who completed his education through the 11th grade. While in school he attended special education classes in a separate section of the school. (TR. 243-44). He speaks, writes, and understands English. (TR. 238). He lives with his fiancé

---

[2]A "developer, automatic" was not defined by the ALJ's decision, the briefs, or the medical record before the court. The court, through its own research, found that this position is defined in the Dictionary of Occupational Titles under code 976.685-014. The job entails operating and maintaining a film machine that develops film shot from cameras.

and two children, who were three and one and one-half years old at the date of the ALJ's hearing. (TR. 42). The plaintiff used to drive, but has not had a license since a string of convictions for driving under the influence of alcohol. (TR. 48). The plaintiff noted he has neither sought nor received treatment for depression or any other mental illness. (TR. 55). The plaintiff reported pain in his back, issues with bending over to tie his shoes, and some numbness in his left leg. (TR. 57). The plaintiff reports that he has problems sitting, standing, twisting, and has a short attention span. (TR. 58).

During a typical day the plaintiff wakes at approximately 7 AM, helps his two young children get dressed, and feeds them breakfast. While his fiancé is at work, the plaintiff watches the children at home for between 8 and 10 hours. He generally sits on the couch watching television while the children play on the floor. (TR. 58-9). His mother often comes by the house to help clean the children and the house, or to take them out to the park. The plaintiff will often go and watch the children from a bench or from the car. (TR. 60). He also needs help cooking or with other activities that require him to stand for prolonged periods of time. (TR. 61).

The plaintiff's back issues go back to January 2008 when Dr. Stephanie Caballo was the plaintiff's treating physician. Between January and May 2008, the plaintiff reported a series of back injuries that were both work related and non-work related. (TR. 420-423). The first occurred when the plaintiff felt his back give way while he was lifting something. Dr. Cabello's evaluation noted he

had lower back pain without any motor or sensory loss. He has a slightly positive straight leg raising test on his left leg, but not on his right leg. Dr. Cabello prescribed Percoset as a way to manage his pain. (TR. 420). The plaintiff returned to Dr. Cabello's office a little over a month later reporting further back problems after his off-road vehicle flipped over on him. He had tenderness in the L5 area of his back, along with a positive straight leg raising test on his left leg and slightly positive test on his right leg. He was treated with Flexeril and Tylenol. She was to order an MRI if his pain got worse. (TR. 421). In May 2008 the plaintiff again reported his back gave out while he was working. The pain was worse than in the past and he had a positive straight leg raising test on both legs. He was referred to physical therapy and prescribed Flexeril and Percoset. A few weeks later Dr. Cabello ordered an MRI for the plaintiff and asked he follow up with her.

In late May 2008 the plaintiff underwent an MRI that indicated he was suffering from a degenerative disc disease at L4-5 with a broad disc bulge. The next month the plaintiff reported his pain was worse and radiated down his back into his legs. He was still working, but did not lift or push heavy objects. Dr. Cabello refilled his prescriptions and referred him to neurosurgery. (TR. 318).

After cancelling several appointments, the plaintiff returned in August 2008 for a visit. The plaintiff still complained of radiating back and leg pain, reported an inability to twist or turn his back, and could not sit or stand for prolonged periods of time. He had a positive straight leg raising test on his left

leg, but not on his right. (TR. 316). Dr. Cabello refilled his prescriptions again, referred him to neurosurgery once he could afford the co-pay, and advised him to return in one month. Around that same time the plaintiff underwent a series of X-Rays and CT scans, none of which revealed any abnormalities in his hips, wrists, or other areas. (TR. 320-25).

At the end of August the plaintiff returned to Dr. Cabello. He reported working, but needed to take a pain pill around noon so he could stay on his feet. Dr. Cabello observed he continued to have a positive straight leg raising test on his left leg and a somewhat positive test on his right. (TR. 314). In a follow-up visit a month later, the plaintiff's condition remained unchanged, but he was not having any weakness in his back and the Percoset treatment managed his pain fairly well. (TR. 313). He suffered another back injury at the end of October when he was carrying a heavy object. He reported severe pain radiating down his back and into both his legs. He had a positive straight leg test for both legs. His prescriptions were refilled and Decadron was added to the regime. (TR. 312). In November the plaintiff went to the emergency room where he was given Vicodin for the pain. This violated his pain contract with Dr. Cabello, so she would no longer give him a prescription for narcotics. The plaintiff opted to seek another doctor. (TR. 310). His last visit with Dr. Cabello occurred in April 2009 and he reported continuing back pain. He had a positive straight leg raising test on his left leg, but not his right. He was prescribed more Tramadol. (TR. 308).

9

Starting in July 2009 the plaintiff began seeing Dr. Pierre B. Turchi who treated him for his continuing back pain. The doctor observed the plaintiff had tenderness in his back near the L4-L5 area, the same location where his MRI indicated he had degenerative disc disease. He also observed weakness in the plaintiff's left foot. He kept the plaintiff on the same regime of drugs and referred him to a local neurosurgeon. (TR. 343). In mid-August the plaintiff went to see Doctor Ali Yousufuddin at the Milton S. Hershey Medical Center. Dr. Yousufuddin noted the plaintiff had to walk with a cane due to the problems with his left leg, but his legs show no muscle atrophy, increased tone, or fasciculation. A straight leg test was negative on both legs. The doctor noted that the MRI showed degenerative disc disease in the L4-L5 region and a slight disc bulge causing less than 25% central canal narrowing on the sagittal cuts. He also had minor foraminal narrowing on both his right and left side due to a broad based disc bulge. (Tr. 360). The doctor found his left leg pain inconsistent with his observations of an L5 radiculopathy affecting the functioning of his leg nerves. He recommended the patient undergo steroid injections in his back and physical therapy. He did not recommend surgical intervention. (Id.). Dr. Yousufuddin also refused to give the plaintiff any further pain medications. (TR. 344).

The plaintiff continued to check in routinely at Dr. Turchi's office and had a follow-up with Dr. Yousufuddin on October 7, 2009. During that follow-up the doctor noted the plaintiff had decreased sensory response to soft touch on his

inner left thigh and weakened motor strength in his plantar and thigh flexion, showing 4/5 strength on the left compared to 5/5 on the right. (Tr. 358). The next day he underwent a steroid shot in his back that was tolerated well. (Tr. 356). He reported to Dr. Turchi four days later than he was in significant pain and needed a refill on his Vicodin, but the doctor would not refill his prescription until October 19, 2009. (Tr. 341). The plaintiff's report to Dr. Yousufuddin in late November was markedly different as he noted a decrease of 25-30% in pain from the shot that lasted approximately one week. The doctor also noted marked tenderness in his left paravertebral area at the L3-4, L4-5, and L5-S1 areas. He also had decreased sensory response in his left leg and continued weakness (4/5) on his left foot. His straight leg raising test was negative on both legs. (TR. 355). He diagnosed him with lumbosacral spondylosis without myelopathy and left lumbar facet syndrome, both are degenerative conditions that cause back pain. (TR. 355). The doctor recommended left lumbar facet medial nerve branch blocks and continued use of Flexeril and Vicodin. (Id.). His follow-up with Dr. Yousufuddin in February indicated he continued to have tenderness in his back, decreased sensory response in his whole left leg, 4/5 motor strength on the plantar flexion on his left foot, and tingling in his left toes. The straight leg raising test was negative on both legs. (TR. 353).

During his visit in late October, the plaintiff still needed a cane to get around and said Vicodin was not helping to alleviate the pain. His doctor changed his prescription to Gabapentin, but the plaintiff could not afford it. He

continued to take Vicodin throughout 2010. (TR. 342, 418). The plaintiff underwent a second steroid shot in January 2010 that was well tolerated, but only provided 25% relief for approximately one day before the pain returned in full-force, according to the plaintiff's reports. (TR. 354-55). Between February 2010 and 2011, the plaintiff's symptoms were mainly treated through the use of Vicodin and other pain medication. (TR. 415-18). He did not return to see Dr. Yousufuddin and did not undergo any further steroid injections.[3]

Dr. Turchi filled out a medical source statement of claimant's ability to perform work-related physical activities in February 2010 that includes some limitations, noting the plaintiff could drive a car for up to 40 minutes. Most significantly, Dr. Turchi opined he would have impaired abilities in terms of reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting/smelling, and continence. (TR. 337-38). The doctor only listed the 2008 MRI in the section delineating the clinical tests and findings relied upon.

On January 31, 2011, Dr. Turchi completed a follow-up lumbar spine residual functional capacity questionnaire. The doctor, in his clinical findings, again noted the MRI from May 2008 as the sole supporting evidence. He stated the patient has symptoms of pain and insomnia from his back issues.[4] The

---

[3]The plaintiff stated he underwent five injections at the hearing before the ALJ, but the records from Dr. Turchi and Dr. Yousufuddin do not indicate any injections after February 2010.

[4]The report includes several notations that appear to read "see copy." (Doc. 349-50). It is unclear to what document the doctor is referring.

plaintiff could sit for up to 15 minutes before having to move and could stand for 15 minutes before having to sit or walk around. The doctor could not estimate how long the patient could sit and stand/walk in an 8-hour day. He would also need to shift positions at will, take unscheduled breaks twice per day for 15 minutes, and walk every 5 minutes for approximately 3-5 minutes at a time. The plaintiff legs would need to be elevated for 4 hours during an 8-hour workday. He could lift less than 10 pounds occasionally and as much as 10 pounds rarely. He could never twist, stoop, crouch/squat, or climb ladders, but he could climb stairs occasionally. He would not have any issues with reaching, handling, or fingering objects. Given the only clinical finding Dr. Turchi used for both the 2010 and 2011 evaluations was the May 2008 MRI, it is unclear why these limitations are so drastically different.

Prior to Dr. Turchi's January 2011 assessment, the plaintiff was evaluated by Dr. Hong S. Park, who reviewed the plaintiff's medical records through February 2010. He concluded that the plaintiff could occasionally lift 10 pounds and could frequently lift less than 10 pounds. He could stand or walk for 2 hours while sitting for 6 hours in an 8-hour day. While sitting, he would need to take breaks to stand or move around to relieve his pain. He had a limited ability to push or pull with his lower extremities. He could occasionally climb stairs or ramps, balance, stoop, kneel, and crouch. He could never crawl or climb ladders, ropes, or scaffolds. He had no manipulative, visual, or hearing limitations. (TR. 373-74). In terms of environmental limits, he should avoid

concentrated exposure to vibrations and hazards, but generally had no limits in that category. (TR. 375). Dr. Hong also noted that the findings from Dr. Yousufuddin were relatively benign when compared to the dire assessment of Dr. Turchi. Beyond those findings, he reviewed the MRI from May 2008 and found that his symptoms are somewhat consistent with those findings, but that the severity and persistence did not align with his conservative treatment and medication usage. (TR. 378).

The plaintiff's mother filled out a functional report that detailed her observations of her son. According to her, he takes care of his daughter, cooks, goes out alone daily, walks with the use of a cane, travels in a car, and can go shopping. He also plays video games and watches television often without any problems. She also noted the plaintiff has some memory issues with taking medicine and managing his own finances. (TR. 249-53). The plaintiff's own questionnaire mirrors his mothers, but also discusses his back pain. He claims it has become worse over the years and has been treated with medication, including Vicodin and Flexeril. He reports that these relieve his pain for several hours without side effects. (TR. 270).

The plaintiff has received little or no treatment for his alleged ADD and other mental impairments over the years, save for evaluations conducted as part of his applications of SSI and DIB. The plaintiff first underwent a clinical psychological disability evaluation by Dr. Jonathan M. Gransee, Psy.D., in

September 2008. Plaintiff received a Global Assessment of Functioning[5] ("GAF") score of 58 during this evaluation. Dr. Gransee determined the plaintiff's prognosis was fair. He could be independent, appropriate, and effective in his daily activities. The plaintiff had fair hygiene, good eye contact, and his attitude was calm, cooperative and respectful. His intelligence was within normal limits or slightly below average. The plaintiff also reported that he had bouts with anger and would occasionally lose his temper, leading him to break something. The doctor diagnosed the plaintiff with Attention Deficit Hyperactivity Disorder (ADHD), Intermittent Explosive Disorder, and a Learning Disorder not otherwise specified. He further concluded the plaintiff had no limits in terms of social functioning and could maintain a job despite his issues with attention and hyperactivity, as long as it was "a good match for him." His opinion was partially based on the plaintiff's past work experience. (TR. 301-2).

Two further evaluations were conducted in April 2010. The first was completed by Dr. Edward J. Yelinek, Ph.D. He found the plaintiff to be

---

[5]A GAF score, or a Global Assessment Functioning scale, takes into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness and is not supposed to include the consideration of impairment in functioning due to physical (or environmental) limitations. The scale ranges from the highest score of 100 to the lowest score of 1." A GAF in the 51 to 60 range indicates some moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).

somewhat depressed, intense, anxious, and that he had poor stamina. The plaintiff also reported spending time with friends, working on cars, and eating properly. The doctor assigned him a GAF score of 55 and found that he had marked limitations with regard to understanding and remembering short, simple instructions; carrying out those instructions; interacting appropriately with the public; interacting appropriately with supervisors/co-workers; responding appropriately to work pressures/change in routine/setting. Moreover, the doctor found extreme limitations in understanding and remembering detailed instructions, carrying out those instructions, and making simple judgments on work-related decisions. He based these findings primarily on the plaintiff's ability to recall three digits forward, two in reverse, and his reports of poor frustration tolerance. (TR. 385). The plaintiff was diagnosed with Adjustment Disorder mixed with depression and anxiety.

Finally, a mental residual functional capacity assessment was completed by Dr. Karen Weizner, Ph.D. She reviewed the entire medical record, along with the evaluations by Dr. Yelinek and Dr. Gransee. She concluded the plaintiff had moderate limitations in the following areas: the ability to understand and remember detailed instructions; the ability to carry out those instructions; the ability to maintain attention and concentration for extended periods; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting. She noted the plaintiff's diagnosis of ADHA and a Learning Disorder, not otherwise

16

specified in support of her findings. She discussed that the plaintiff is able to care for himself, shop, get along with friends, play video games, and that he maintained several jobs previously. Dr. Weizner found the plaintiff to have a low tolerance for frustration, but could maintain in a production oriented setting with simple, one or two-step tasks, without significant oversight. (TR. 396-97).

During the hearing, the ALJ consulted a vocational expert (VE), Andrew D. Caparelli. The ALJ's hypothetical about the plaintiff's residual functional capacity (RFC) was limited to light work that required normal breaks every one and one-half to two hours, along with regular unscheduled breaks to use the restroom. The ALJ specifically limited him to occasionally climbing stairs, stooping, kneeling, crouching, squatting, and being exposed to extreme cold. He required the plaintiff be limited to unskilled work with limited exposure to the public. The VE determined the plaintiff could perform some of his past work, specifically as a developer, automatic (film developer). The VE further concluded the plaintiff could work as a conveyor line bakery worker, cannery worker, final assembler, and a table worker. These jobs are all unskilled, while the former two are light work and the latter two are both sedentary work. (TR. 30-31).

## VI.   DISCUSSION

A claimant bears the burden of establishing that his or her impairment meets or equals a listed impairment. *Young v. Comm. of Social Sec.*, 322

F.App'x 189,190 (3d Cir. 2009)(*citing Poulos v. Comm. of Social Sec.*, 474 F.3d 88, 91 (3d Cir. 2007)). To match a listed impairment under the regulations, a claimant's impairment must satisfy all of the criteria for the listing. 20 C.F.R. §404.1525(c)(3). If the claimant's impairment matches or equals a listed impairment, then she is disabled, and no further analysis is necessary. *Cunningham v. Comm. of Social Sec.*, 507 F.App'x 111, 115 (3d Cir. 2012)(*citing Brewster v. Heckler*, 786 F.2d 581, 584-84 (3d Cir. 1986)). The court considers symptoms, the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of the record. 20 C.F.R. §404.1529.The ALJ need not use particular language or a particular format at step 3, as long as the decision permits meaningful judicial review. *Ortega v. Comm. of Social Sec.*, 232 F.App'x 194, 197 (3d Cir. 2007)(citations omitted).


A.     The ALJ Committed a *De Facto* Reopening of the Plaintiff's Previous Case

As an initial matter, the court agrees with the plaintiff that the ALJ's consideration of evidence submitted in conjunction with the previous claim acts as a *de facto* reopening of that case. The defendant argues that the ALJ merely reviewed past medical evidence to give the plaintiff the benefit of the doubt in composing a full picture of his medical history. Moreover, the defendant claims that the ALJ specifically denied the plaintiff's motion to reopen the previous

case.

Generally, a decision by the Secretary is not judicially reviewable, but the court may canvass the record to determine whether a reopening has occurred. *Coup v. Heckler*, 834 F.2d 313, 317 (3d Cir. 1987) *abrogated on other grounds*, *Gisbrecht v. Barnhart*, 525 U.S. 789 (2002). As a decision to explicitly reopen the case is not subject to judicial scrutiny, the court may review whether a *de facto* reopening occurred. *Coup*, 834 F.3d at 317. *Coup* created a two-step test whereby a court must look to whether the ALJ "addressed" the prior decision and, if not, whether the ALJ reviewed the record as a whole and reached a decision on the merits. *Kaszer v. Massanari*, 40 F. App'x 686, 693-94 (3d Cir. 2002). In *Kaszer*, the Third Circuit found a *de facto* opening occurred when the ALJ reviewed six exhibits from a prior claim and used that evidence to make a decision on the merits without revisiting the prior ALJ's determination. 40 F. App'x at 694.

Turning to the first part of the test, the ALJ explicitly declined to reopen or address the prior decision. Moreover, her decision contains no discussion of the *res judicata* effect of the prior decision. Therefore, the ALJ did not "address" the prior decision. Next, it appears that the ALJ considered relevant medical evidence that was included in the plaintiff's first application. Specifically, the plaintiff cites the July 2009 Lumbar Spine Residual Function Capacity Questionnaire by Dr. Turchi, (TR. 349), Dr. Gransee's evaluation, (TR. 296), Dr. Cabello's treatment notes, and the notes from Dr. Yousufuddin. These

pieces of evidence were relied upon in making the prior determination. (TR. 90-91). This medical evidence was discussed thoroughly in the present decision. She outlined Dr. Cabello's treating notes, (TR. 25-26), Dr. Yousufuddin's findings, (Id.), and Dr. Gransee's psychological review, (TR. 27-28). The ALJ also made her decision "after careful consideration of the entire record." (TR. 22).

In sum, this case presents a parallel to *Kaszer* "such that [the ALJ's] actions were sufficient to reopen Kaszer's first application *de facto*." [40 F. App'x at 695](). For those reasons, the court finds the ALJ's review and reliance on the prior medical documents was a *de facto* opening of the earlier decision. However, this finding only affects the outcome of this particular case if the plaintiff's appeal is granted.

### B. The ALJ's RFC Sufficiently Considered the Plaintiff's Mental Impairments

The plaintiff contend's the ALJ's RFC is fatally flawed because it failed to address the impairments associated with ADD. The defendant claims that, in light of the evaluations of Doctors Gransee, Weizner, and Yelinek, the ALJ properly accounted for his mental limitations. The plaintiff has presented no medical evidence beyond these assessments in support of his application for benefits. The plaintiff also only underwent these psychological reviews after he applied for SSI and DIB.

The ALJ limited the plaintiff to "unskilled work tasks involving no more than occasional[ly] working directly with the public." This was the entirety of his limitation with regard to the plaintiff's ADD. The Commissioner must consider all of the evidence before him when determining the severity and impact of the plaintiff's alleged impairments. *Dobbs v. Astrue*, 2013 WL 705554, *7 (D.N.J. Feb. 19, 2013)(citing 20 C.F.R. §404.1527). SSR 96-8 "requires ALJs to consider all relevant evidence when assessing claimants' residual functional capacities" and to explain why he is assigning various weights to differing medical opinions. *Vega v. Commissioner of Social Sec.*, 358 F. App'x 372, 375 (3d Cir. 2009).

In sum, Dr. Gransee found the plaintiff had no issues with social functioning or interaction with superiors. Dr. Weitzner's opinion supports Gransee's conclusion to a degree, noting the plaintiff could understand simple instructions, work in a stable environment, maintain regular attendance, and would not require special supervision to complete his tasks. Dr. Weitzner's overall conclusion supports the ALJ's RFC as it states, "[t]he limitations resulting for the impairment do not preclude the [plaintiff] from performing the basic mental demands of competitive work on a sustained basis." These findings are consistent with the plaintiff's previous ability to maintain work and his reports of his daily activities.

The plaintiff had a series of occupations prior to his 2008 fall, maintains a group of friends, interacts appropriately with his children, mother, and fiancé,

and has exhibited almost no conflict with his doctors. Moreover, the report of Dr. Yelinek stands alone in terms of the severity of the plaintiff's limitations. The ALJ properly gave it little weight. In sum, it was not error to limit the plaintiff to unskilled work with limited exposure to the public given his relatively minor symptoms stemming from his ADD.

### C.  The ALJ Gave Appropriate Weight Dr. Turchi's Medical Opinions and the Medical Evidence of Record

The plaintiff next contends it was error for the ALJ not to give Dr. Turchi's opinion controlling weight. The defendant claims the ALJ's decision is supported by substantial evidence and the ALJ was justified in according Dr. Turchi's evaluations little weight.

The Court of Appeals for the Third Circuit set forth the standard for evaluating the opinion of a treating physician in the case of *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000). The Court stated:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer* [v. *Apfel*, 186 F.3d 422, 429 (3d Cir.1999)] (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); see also *Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones*, 954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585. Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058,

1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. See *Adorno*, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115.

*Id.* at 317-318.

Similarly, the Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it is to be given controlling weight. 20 C.F.R. §416.927(d)(2). When the opinion of a treating physician is not given controlling weight, the length of the treatment relationship and the frequency of examination must be considered. The Regulations state:

> Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non-treating source.

20 C.F.R. §416.927(d)(2)(I).

Additionally, the nature and extent of the treatment relationship is considered. The Regulations state:

> Generally, the more knowledge a treating source has about your

impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

20 C.F.R. §416.927(d)(2)(ii).

Dr. Turchi began treating the plaintiff after he violated his pain contract and Dr. Cabello refused to prescribe him any more narcotics. In the roughly 20-month span of his treatment, Dr. Turchi consistently managed his pain with prescription drugs and did not order any objective testing. Dr. Turchi's assessments also show internal inconsistencies. His lumbar spine residual functional capacity questionnaire from January 2011 conflicts quite drastically with other limitations noted in February 2010, despite there being no further MRIs or other objective tests to evaluate the plaintiff's reports of worsening back pain. (TR. 337-38). Although making fairly exact findings with regards to the plaintiff's sitting and standing requirements, he could not determine how long the plaintiff could sit or stand during an eight hour workday. (TR. 413). These internal inconsistencies, lack of objective tests, and the conservative

treatments are not consistent with a severe or debilitating disability.

It further appears that Dr. Yousufuddin and Dr. Turchi were almost directly at odds in terms of evaluating the plaintiff's medical condition. Dr. Yousufuddin's found that the plaintiff's complaints of left leg pain were inconsistent with the MRI. He also found that the plaintiff had a negative straight leg raising test on both legs, while Dr. Turchi observed a positive straight leg raising test on the left side. The plaintiff's reports to both doctors were also inconsistent as he told Dr. Yousufuddin he had 25-30% relief for one week from the steroid shot, while he reported little or no relief to Dr. Turchi when he called for an early refill on his Vicodin. (TR. 355). Moreover, he continued to report worsening pain to Dr. Turchi and that his medications were not helping, but later stated that the medicine relieves his pain for several hours at a time. (TR. 270). After the defendant stopped getting the steroid shots, Dr. Turchi did not recommend any further treatment save managing the plaintiff's pain with Vicodin and other drugs.

Further, Dr. Turchi's evaluation is inconsistent with the plaintiff's own reports of his daily activities. He wakes early in the morning to dress and feed his young children, watches them for most of the day, spends many hours sitting watching television and playing video games, goes out shopping,

spending times with friends, and occasionally works on cars. (TR. 58-60; 381). Dr. Hong also reviewed the plaintiff's medical records and determined that his limitations were not nearly as severe as he claimed. Dr. Hong noted the discrepancy between Dr. Turchi's assessment and Dr. Yousufuddin's findings when determining the plaintiff's physical limitations. In sum, the ALJ properly weighed Dr. Turchi's evaluation given it was not supported by substantial medical evidence of record.

The plaintiff also contests the ALJ assigning little weight to Dr. Hong's exertional restrictions. The ALJ specifically concluded that these restrictions were an exaggeration of the plaintiff's limitations. (TR. 29). As discussed above, Dr. Yousufuddin's review of the MRI found that the plaintiff's left leg pain was inconsistent with the May 2008 MRI. Dr. Turchi did not order the plaintiff to undergo any further imaging. (TR. 355). The other test ordered by Dr. Cabello showed normal results. (TR. 320-25). The plaintiff managed his pain almost exclusively through the use, and sometimes overuse, of narcotic drugs. Further, the plaintiff had some weakness (4/5) in his left leg and reported problems with his leg giving out only occasionally. The court finds that the ALJ properly analyzed and weighed the objective medical evidence of record and assigned Dr. Hong's evaluation appropriate weight.

The ALJ rested most heavily on the objective medical evidence of the MRI and Dr. Yousufuddin's findings relative to that MRI. The vast majority of the other evidence stems almost completely from plaintiff's often contradictory self-reporting of his condition. Given the light treatment, sparse medical records, and both internal and external inconsistencies between these reports, the ALJ did not err.

D.     The ALJ Properly Concluded the Plaintiff could still Perform his Past Relevant Experience as a Developer, Automatic (Film Developer)

The plaintiff lastly argues that the ALJ improperly concluded the plaintiff could perform his past relevant work as a developer, automatic (film developer). As the plaintiff notes in his brief, this argument is basically identical to the contentions about the weighing of the Dr. Turchi's opinion and the other medical evidence. For the reasons discussed above, the ALJ did not err in evaluating and weighing the medical evidence. The ALJ properly found that the plaintiff retained the RFC to perform his past work as a film developer.

## VII.   CONCLUSION

For the above discussed reasons, the plaintiff's appeal of the decision of the Commissioner of Social Security, (Doc. No. 1), is **DENIED**. An appropriate order will follow.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: April 28, 2014**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-1280-01.hhs.wpd